**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| **STEPHEN J. CROSS** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No.** |
| | : | **7:07-CV-80-HL** |
| **STAFFORD HOSPITALITY, INC., and** | : | |
| **GREGORY B. BROSIUS,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

# ORDER

Before the Court are Defendants' Motions for Summary Judgment (Doc. 43, 46). For the following reasons, Defendants' Motions are granted.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    Factual History

This is an employment retaliation case arising out of Defendants' termination of Plaintiff.  The facts, viewed in the light most favorable to Plaintiff as the non-moving party, are as follows.[1]  In September 2006, Plaintiff Stephen Cross was employed by Stafford Hospitality Inc. ("Stafford"), which owns and operates several hotel locations, as its Director of Operations.  (Cross Decl. ¶ 2.)  In this capacity,

---

[1]  In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004).

1

Cross was in charge of all Stafford hotel properties, which included locations in Tallahassee, Florida; Branson, Missouri; Bluffton, South Carolina; Tifton, Georgia; and Savannah, Georgia.  (Cross Dep. 60-63.)  The General Manager ("GM") of each property reported to Plaintiff.  Plaintiff reported to Gregory Brosius ("Brosius"), President of Stafford.  (Cross Dep. 63.)

A primary indicator for the performance of the hotels is the guest satisfaction scores.  (Cross Dep. 121-122; Brosius Dep. 82.)  The guest satisfaction scores are calculated by tallying the results of surveys sent to hotel guests.  Under this system, a 73.99 and below is considered failing; 74–77.99 is action required; 78–84.99 is acceptable; 85–89.99 is commendable; and 90-100 is excellent.[2]  (Pl.'s Ex. 1.)

Pursuant to a franchise agreement with Intercontinental Hotel Group ("Intercontinental"), Stafford owns the Savannah location and is allowed to use the Holiday Inn brand name under the condition it maintains the guest satisfaction scores at an appropriate level.  (Brosius Dep. 16-17, 63.)  When Plaintiff began working for Stafford the Savannah location had been receiving failing guest satisfaction scores. (Cross Decl. ¶ 3.)  Therefore, as a matter of first priority, Brosius directed Plaintiff to spend the majority of his time and efforts working at the Savannah location.

_____

[2] The guest satisfaction scores were based on two successive scoring mechanisms.  The first, known as Guest Survey Tracking Scores ("GSTS"), used a prior 4-month average of guest satisfaction scores.  The second, known as Overall Satisfaction Index/GuestView ("OSI"), used a twelve month average. GSTS was in effect during Plaintiff's employment until February 15, 2006, after which OST was implemented.

(Cross Decl. ¶ 2.)  Plaintiff's success, or lack thereof, in his position of Director of Operations was therefore largely dependent upon the success of the Savannah location.

The parties vigorously dispute whether and to what extent Plaintiff was successful at the Savannah location.  Upon review, the following is apparent: There is no dispute that following Plaintiff's employment the guest satisfaction scores at the Savannah location initially improved, bringing the location out of failure into action required.  (Brosius Dep. 96.)  During the Spring of 2006, the guest satisfaction scores were not reaching the desired levels, however.  Although the guest service scores did not appear to decline precipitously, Plaintiff affirms they were "headed in the wrong direction" during May.  (Cross Dep. 75-76.)  For example, when Plaintiff began in September 2005, the Savannah location obtained a 74.19 twelve month average.  (Brosius Dep 200.)  In May 2006, it only obtained a 73.79 twelve month average,  reflecting a lower score than when Plaintiff began as Director of Operations.[3]  (Brosius Dep. 201.)  Plaintiff argues the primary explanation for lack of improvement was due to the poor physical condition of the Savannah location, over which he had no control.  (Cross Decl. ¶¶ 5, 6.)

Concerned with the guest satisfaction scores, sometime in May 2006, Defendant met with both Plaintiff and Steve Worthington ("Worthington"), the GM of

_____

[3] Plaintiff contests this fact, but Plaintiff points to nothing in the record that controverts it.

the Savannah location at the time.  (Cross Dep. 68-70.)  Plaintiff and Worthington both allege that during this meeting Brosius repeatedly emphasized they needed to change the "demographics" of the Savannah hotel's front desk and hire individuals who looked like Kelly Daily, a white female who then worked at the front desk. (Cross Dep. 69-73; Worthington Decl. ¶ 7.)  After responding that they had already made changes to the personnel at the hotel's front desk, Brosius allegedly responded that the front desk still "looked the same" to him. (Cross Dep. 70; Worthington Decl. ¶ 7.)  According to Plaintiff, the reason Brosius wanted different front desk employees was because of their race; at the time, the vast majority of the guest service agents at the Savannah location were African-American.  (Worthington Decl. 3.)  Plaintiff and Worthington further allege that Plaintiff vocalized his opposition to Brosius's comments at the meeting by stating they were inappropriate and would no longer be discussed.  (Cross Dep. 68-70; Worthington Decl 7.)

On June 22, 2006, Plaintiff informed Julie Bullington ("Bullington"), Stafford's Human Resources Manager, in a private conversation that Brosius had requested on numerous occasions the termination of African-American employees.  (Cross Dep. 67-68; Bullington Dep. 86-87.)  After this private conversation between Plaintiff and Billington, Bullington directed Plaintiff to submit the oral complaints in writing. (Bullington Dep. 88.) On June 26, Plaintiff submitted the requested written complaint via email, which describes several alleged incidents Plaintiff believes reflect Brosius's racial animus.  (Stafford's Ex. C.)  These alleged incidents include the

4

following: (1) directives by Brosius in October of 2005 to terminate a front office manager, who was African-American, because she hired people that "look like her"; (2) statements by Brosius that the Savannah location needed a staff that looked like the staff in Tifton, Georgia (which is predominately white); and (3) business visits to local restaurants to view the type of employees that should be hired, during which Brosius would point out white people, calling them "happy, friendly people." Additional alleged incidents that Plaintiff believes reflect Brosius's racial animus, but that were not stated in the email, include: (1) comments by Brosius to Worthington that the Savannah hotel needed to hire white people to work at the front desk[4]; (2) the declaration of Jennifer Jones ("Jones"), who worked as an administrative assistant and assistant sales person at Stafford's Savannah location, claiming Brosius's demeanor towards her changed from friendly and cordial to one of silence after seeing her children were bi-racial;[5] and (3) an email from Brosius to Plaintiff, in which Brosius comments on a prospective new employee for the Savannah location whose background check revealed no previous criminal history, stating "[c]ertainly may not fit . . . no time served." (Worthington Decl. ¶ 9; Jones Decl. ¶ 7;

---

[4] In his Declaration, Worthington states this incident occurred during his initial interview in Savannah. The exact date of this interview is not apparent from the record. However, the record does reveal that Worthington began working for Stafford on March 5, 2006. (Worthington Decl. ¶ 2.)

[5] Defendant objects to the admissibility of the Declaration of Jones on grounds that it constitutes inadmissible hearsay. The cited portion of Jones Declaration is not hearsay and is clearly based off her personal opinion.

Brosius Dep. 138.)

On June 26, 2006, Brosius terminated Plaintiff.  Plaintiff believes he was terminated in retaliation for opposing Brosius's alleged comments in mid-May, and for subsequently relaying his opposition to that comment and other alleged comments to Bullington on June 22.  According to the Defendants, Plaintiff was terminated for poor performance and because he allegedly did not work well with the GMs.[6]

### B. Procedural Background

After Plaintiff was terminated, he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Following receipt of the notice of right to sue letter from the EEOC, Plaintiff filed suit in this Court on June 29, 2007.  In his Complaint, Plaintiff asserted, among other things, employment discrimination under Title VII of the Civil Rights Act of 1964.[7]  Plaintiff also brought a state tort claim of false imprisonment and assault againt Brosius, arising from the circumstances of Plaintiff's termination on June 26, 2006.

---

[6] Stafford submitted affidavits of three GMs as support for the proposition Plaintiff did not work well with the Gms.  Plaintiff objects to the exhibits on the grounds they are inadmissible hearsay and not based on personal knowledge. The Court agrees that portions of the affidavits are based off inadmissible hearsay.  However, to the extent the individual GMs proffer their own personal opinion as to Plaintiff, the Court will consider those potions of the affidavits.

[7] Plaintiff also asserted a claim for negligent supervision, retention and training (Count II).  This claim was dismissed upon a stipulation of dismissal by all parties.

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, (1986).  When considering a motion for summary judgment, the Court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55.  The Court may not, however, make credibility determinations or weigh the evidence. Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted).  If the moving party meets this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the

7

nonmoving party is not entitled to a judgment as a matter of law. Id. at 324-26. This evidence must consist of more than mere conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Under this scheme summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

### B.    Title VII Claim[8]

Title VII provides, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). As with a discriminatory treatment claim, a plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case; a plaintiff must show by a preponderance of the evidence that (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was some causal relationship between the two events. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2410-16 (2006).

Once a Plaintiff has established a prima facie case, the burden shifts to the

---

[8] Title VII does not contemplate individual liability. Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996). Therefore, Plaintiff's Title VII is against Stafford only.

defendant to articulate a legitimate, nonretaliatory reason ("LNR") for the challenged employment action.  Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1073, 1075 n.54 (11th Cir. 1995) (per curiam).  If the defendant articulates a LNR, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason for the adverse action is pretextual.  Id.  The plaintiff can prove pretext either directly "by persuading the court that it was more likely that a discriminatory reason rather than the proffered reason motivated [the employer]" or "indirectly by showing that the employer's proffered explanation was unbelievable, i.e., that its reason was a pretext."  Morgan v. City of Jasper, 959 F.2d 1542, 1548 (11th Cir. 1992) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981)).

### 1.    Prima Facie Case

Stafford concedes that Plaintiff has suffered an adverse employment action but argues Plaintiff can not establish either that he engaged in a protected activity or that there was a causal relationship between the adverse employment action and a protected activity.  As to the first element of Plaintiff's prima facie case, he can prove that he engaged in a protected activity if "he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 2006).  Moreover, "the protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally

voice complaints to their superiors or who use their employers' internal grievance procedures." Rollins v. State of Fla. Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1998).

Stafford contends Plaintiff can not establish he engaged in a protected activity because no reasonable person in Plaintiff's position would have believed that Brosius encouraged the termination of front desk employees at the Savannah location based on race. Upon reviewing the record, the Court disagrees. For instance, when questioned about the mid-May meeting, Plaintiff stated in deposition:

A.   In that meeting he specifically berated [Worthington] and myself for not changing the demographics at the front desk despite the fact that he had told us that was what he wanted and what he expected. We made the comment to [Brosius] that there had been changes at the front desk. And his comment back was that it looks the same to him.

Q.   Did he say - - in this litigation the phrase change the demographics has shown up almost constantly. Is that a [Brosius] phrase or is that [your] phrase or is that just something we've chosen to call it?

A.   That is [Brosius's] phrase that he would use continuously over and over again. However, it was interchangeable with - - changing the demographics was interchangeable with I want white people at the front desk because he would say that specifically from time to time.

Q.   He would say I want white people at the front desk?

A.   Yes.

(Cross Dep. 69-70.)

Furthermore, when questioning Plaintiff on whether Brosius specifically stated that he wanted whites at the front desk of the Savannah location, Plaintiff replied:

A.    Not those specific words . . . It was I want to have people that look like Kelly Daily [who is white]. . .

Q.    Do you know whether [Brosius] was referring to her whiteness or her happiness and her friendliness?

A.    Based on the context of her previous conversations her whiteness and her happiness and friendliness.  We want happy friendly people.  But [Brosius] always made it clear that it was the demographic change of moving black people out and bringing white people in because he would say this continuously and throughout.

(Cross Dep. 72-73.)

Stafford's argument that Plaintiff could not have a good faith reasonable belief that an unlawful employment practice occurred is belied by the context of Brosius's alleged statements and inferences that follow therefrom.   Therefore, accepting Plaintiff's allegations concerning the mid-May meeting with Brosius as true, and drawing all logical inferences in Plaintiff's favor, Plaintiff undoubtedly engaged in a protected activity by directly complaining to Brosius about his continued allusions to replacing the predominately African-American front desk with more whites.

To show causation, a claimant need only establish that "'the protected activity and the adverse action were not wholly unrelated.'" Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (quoting Clover v. Total Sys. Servs., 176 F.3d 1346, 1354 (11th Cir. 1999)).  A claimant can establish causation by providing "'sufficient evidence' of knowledge of the protected expression and 'that there was a close temporal proximity between this awareness and the

adverse . . . action.'" Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)

(quoting Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1180 n.3 (11th Cir.

2003)).  But the temporal proximity between knowledge of the protected activity

and the adverse action must be "'very close.'"  Id. (quoting Clark County Sch. Dist.

v. Breeden, 532 U.S. 268, 273 (2001)).  "If there is a substantial delay between the

protected expression and the adverse action in the absence of other evidence

tending to show causation, the complaint of retaliation fails as a matter of law."  Id.

Here, Plaintiff has established a causal nexus between the protected

speech, occurring in mid-May, and the adverse employment action, occurring only

four to five weeks later on June 26, 2006.  In Farley, the Eleventh Circuit held that

a seven week gap between protected speech and an adverse employment action

was sufficient to establish causation.  197 F.3d at 1337.  Therefore, finding that

the Plaintiff has proffered sufficient evidence of Brosius's knowledge of Plaintiff's

protected expression, it can be said that a four to five week gap is a fortiori

sufficient to create a genuine issue of material fact for causation.[9]

2.    LNR

The burden now shifts to Stafford to produce evidence to indicate that it

actually terminated Plaintiff because of one or more LNRs.  Stafford's LNRs for

---

[9] Because the Court finds the mid-May meeting sufficient to establish
causation, an analysis of whether the June complaints establish causation is not
warranted.

terminating Plaintiff are poor performance and because he allegedly did not work well with the GMs.  The Court finds that Defendant has put forth sufficient evidence to support its articulated LNRs.  Thus, the burden is on Plaintiff to demonstrate pretext.

       3.    Pretext

Once the defendant has articulated a LNR for its actions, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is pretext for illegal discrimination." Wilson, 376 F.3d at 1087.  If the employer proffers multiple LNRs, the plaintiff must rebut each of the reasons to survive summary judgment. Crawford v. City of Fairburn, 482 F.3d 1305, 1308 (11th Cir. 2007) (citing Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)).  To show that a defendant's stated reasons are pretext, the plaintiff must offer evidence that "cast[s] doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs v. Plantation Patters, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Cooper-Houston v. So. Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)). In other words, a plaintiff may establish that his employer violated Title VII by demonstrating "such weaknesses, implausibilities, inconsistences, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them

13

unworthy of credence."  Id. (quoting Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1072 (3rd Cir. 1996)).

Stafford produced evidence that Plaintiff was terminated for poor performance and inability to work well with the GMs.  To rebut the LNRs, Plaintiff has pointed to three pieces of evidence that could be arguably persuasive in an attempt to show pretext: (1) statements by Brosius that tend to reflect his racial animus; (2) evidence that the guest satisfaction scores reflect Plaintiff was not performing poorly; and (3) evidence that the poor physical condition of the Savannah location was the primary reason guest services scores were not higher. Essentially, Plaintiff argues that Brosius's statements demonstrate that Brosius did not want African-Americans working at the front desk of the Savannah location, and therefore, the statements are circumstantial evidence that Plaintiff was terminated for opposing those unlawful directives.  Plaintiff further contends that this evidence, coupled with evidence that his performance was adequate, is sufficient to create a genuine issue of fact on pretext.

Stafford argues that Plaintiff has not presented sufficient evidence to show its LNRs for terminating Plaintiff are pretext.  Stafford contends it is undisputed Plaintiff could not raise the guest service scores at the Savannah location to an acceptable level.  Specifically, Stafford asserts the guest satisfaction scores were lower when Plaintiff was terminated than when Plaintiff was initially employed.  In fact, Stafford points to Plaintiff's own admission that the guest service scores in

14

early May were "going in the wrong direction." (Cross Dep. 75-76). Finally, Stafford argues that Plaintiff has presented no evidence to refute that he did not work well with the GMs.

The Court agrees with Stafford that Plaintiff has failed to present sufficient evidence to rebut the LNRs because he has failed to show either that the scores were not, in fact, inadequate or that he did work well with the GMs. Plaintiff has attempted to paint an optimistic caricature of the guest satisfaction scores during the months prior to his termination. For instance, Plaintiff points out that in mid-April the Savannah location received a perfect guest satisfaction score and that for the last two weeks in April and the first week in May the average twelve month scores rose from 70.83 to 75.00 to 82.14, respectively. Plaintiff argues these weekly guest satisfaction scores, along with other specific weeks during April, May, and June, demonstrate Plaintiff's performance was not poor. However, Plaintiff's cherry-picking of weekly guest satisfaction scores is a mere attempt to veil the declining monthly scores. There is no dispute that monthly scores in April and May were low enough, in total, to pull the May *twelve-month* guest satisfaction scores down to a 73.79–a level considered to be failing.

Plaintiff, apparently recognizing the deficiencies in his argument, then argues that he is not responsible for the poor guest satisfaction scores because he had no control over the poor physical condition of the Savannah location. But, even if a reasonable fact finder did believe Plaintiff's contention that the guest

15

satisfaction scores would improve if Stafford made capital improvements to remedy the poor physical condition of the Savannah location, pretext would still not be established.

Plaintiff's primary job function was to raise guest satisfaction scores at the Savannah location.  Although the guest satisfaction scores improved initially, the record clearly indicates they began to decline prior to Plaintiff's termination. Finding Plaintiff was not meeting the objectives of consistently improving the guest satisfaction scores, he was terminated.  It is immaterial that Plaintiff believed his performance was adequate.  See Chapman, 229 F.3d at 1051 (noting the "employee's 'perception of himself . . . is not relevant.  It is the perception of the decision maker which is relevant") (quoting Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)).  Nor is it material that Plaintiff feels the guest service scores would have improved if Stafford made capital improvements.  Id.  ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.").  All that matters is whether the employer "gave an honest explanation of its behavior."  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)). In short, Plaintiff's evidence is not sufficient to allow a reasonable fact finder to conclude that Stafford's LNR for terminating Plaintiff, namely the decline in guest satisfaction scores, was not the real reason for the decision.  Having failed to

demonstrate pretext as to his termination for poor performance, the Defendant's additional LNR need not be analyzed.

Plaintiff's last piece of evidence to rebut Stafford's LNRs, statements by Brosius that tend to reflect his racial animus, is insufficient to create a genuine issue of fact as to pretext standing alone.  In Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998), the Eleventh Circuit held that discriminatory comments, though not sufficient to serve as direct evidence of discrimination, can contribute to a circumstantial showing of pretext.  The Eleventh Circuit has cautioned, however, that discriminatory comments are not necessarily sufficient, by themselves, to show pretext.  Rojas, 285 F.3d at  1343.  The Eleventh Circuit in Rojas observed that the stray comments in Ross supported an inference of discrimination because the plaintiff presented "fairly strong additional evidence [that] supported a finding of pretext."  Id.  Here, Plaintiff has presented no such additional evidence.  Plaintiff's argument for demonstrating pretext is essentially founded on two pieces of evidence: the guest services scores and statements reflecting racial animus.  However, in finding that the former evidence only bolsters Stafford's LNR of poor performance, the latter evidence is insufficient, in this case, when standing alone.  See Crawford, 482 F.3d at 1308-09 (finding that discriminatory statements reflected retaliatory animus but nevertheless failed to refute the defendant's LNR of poor performance); Scott v. Suncoast Beverage Sales, LTD., PMBA, 295 F.3d 1223, 1230 (11th Cir. 2002) (finding that an

17

employer's discriminatory statement was insufficient to create a triable issue of fact "absent additional evidence of pretext"); Bowen v. Jameson Hospitality, LLC, 214 F.Supp.2d 1372, 1383-85 (S.D. Ga. 2002) (finding that employer's racists comments were circumstantial evidence of pretext but insufficient absent additional persuasive evidence of pretext).

In sum, the Court concludes that Plaintiff failed to provide sufficient evidence to allow a reasonable fact finder to conclude that Stafford's LNRs were not the real reason for the decision to terminate Plaintiff.  Accordingly, the Court holds that Plaintiff has failed to show that issues of fact exist as to whether Stafford's reasons were pretext, and therefore, Stafford is entitled to summary judgment on Plaintiff's retaliation claim under Title VII.

### C.    False Imprisonment and Assault Claims

Plaintiff has also filed state tort claims of false imprisonment and assault arising from his termination.  On June 26, 2006, Plaintiff was personally terminated by Brosius in the GM's office of the Savannah location.  According to Plaintiff, after he was informed of his termination, he protested and wanted to know why the decision was made.  After Plaintiff failed to receive an explanation, he attempted to leave the office, but Brosius allegedly put his hand on the door nob, blocking his egress, and told Plaintiff to sit down, that Plaintiff was not going anywhere, and that he first wanted Plaintiff's company cell phone and laptop computer back or else he would call the police.  Plaintiff then proceeded to make

18

several phone calls to Stafford Development's office to discuss the termination. While Plaintiff proceeded to make those phone calls, Brosius was on the phone having Plaintiff's access to company related items removed. After approximately 2-3 minutes Brosius told Plaintiff to leave. Nevertheless, Plaintiff did not leave but rather remained on the phone. Finally, Plaintiff alleges that while he was leaving the office after making the phone calls, Brosius was "nose to nose" with him shouting obscenities. The event lasted approximately 10 minutes.

Under Georgia law, false imprisonment is "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51-7-20.

> [T]he imprisonment need not be for more than an appreciable length of time, and . . . it is not necessary that any damage result from it other than the confinement itself, since the tort is complete with even a brief restraint of the plaintiff's freedom . . . It is essential, however, that the restraint be against the plaintiff's will; and if he agrees of his own free choice to surrender his freedom of motion, as by remaining in a room or accompanying the defendant voluntarily, to clear himself of suspicion or to accommodate the desires of another, rather than yielding to the constraint of threat, then there is no imprisonment.

J.H. Harvey Co. v. Speight, 178 Ga.App. 812, 813, 344 S.E.2d 701, 702 (1986)

(internal quotations omitted).  Restraint may occur by words or threats alone but must produce a reasonable fear that physical force will be used otherwise. Shannon v. Office Max N. Am., Inc., 291 Ga.App. 834, 835, 662 S.E. 885, 888 (2008).

The facts do not indicate that Plaintiff was faced with a reasonable fear that force would be used to keep him in the office.  Plaintiff remained in the room on his own free will to call Stafford Development's office to discuss his termination. Even if Brosius did place his hand on the door nob and tell plaintiff to sit down, the record does not indicate Plaintiff was physically restrained or threatened with physical force.  Rather, Brosius provided Plaintiff with an ultimatum of either sitting down and turning over the company items or the police would be called.  Such threats to do not constitute detention for purposes of false imprisonment.  See id. (finding no claim of false imprisonment where plaintiff was told he would be prosecuted if he left).

Plaintiff has also failed to establish facts sufficient to constitute a claim of assault.  O.C.G.A. § 51-1-14 provides that "[a]ny violent injury or illegal attempt to commit a physical injury upon a person is a tort for which damages may be recovered."  Georgia case law establishes that an actual touching is not a necessary element of the tort of assault; it is only necessary to show an intention to commit an injury, coupled with an apparent ability to do so.  Wallace v. Stringer, 250 Ga.App. 850, 853, 553 S.E.2d. 166 (2001).   At no point did Brosius make

physical contact with Plaintiff or attempt to physically harm Plaintiff.   Accordingly, the Court holds that Plaintiff has failed to show that issues of fact exist as to whether Brosius is liable for either assault or false imprisonment, and therefore, Brosius is entitled to summary judgment on both claims.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment are GRANTED.

**SO ORDERED**, this the 31st day of March, 2009.


/s/ Hugh Lawson                       
**HUGH LAWSON, Judge**

wjc

21